UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAWRENCE ALBERT          )
                         )
          Plaintiff,     )
                         )
     v.                  )          Civil Action No. 17-1572 JEB
                         )
                         )
SONNY PERDUE,            )
 Secretary of Agriculture, )
                         )
          Defendant.     )
_____)

## **MOTION FOR SUMMARY JUDGMENT**

Defendant, the Secretary of Agriculture, pursuant to Fed. R. Civ. P. 56, hereby moves for summary judgment in his favor, because there are no material issues of fact and Defendant in entitled to judgment.

May 3, 2019

Respectfully submitted,

JESSIE K. LIU, DC Bar #472845
United States Attorney

DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division

By:_____/s/
    W. MARK NEBEKER, DC Bar #396739
    Assistant United States Attorney
    555 4th Street, N.W.
    Washington, DC  20530
    (202) 252-2536
    mark.nebeker@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAWRENCE ALBERT    )
            )
    Plaintiff,   )
            )
  v.        )   Civil Action No. 17-1572 JEB
            )
            )
SONNY PERDUE,    )
 Secretary of Agriculture,  )
            )
    Defendant.  )
_____)

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

   Defendant respectfully submits this Memorandum of Points and Authorities in support of

his Motion for Summary Judgment.

**I.  SUMMARY OF THE CASE**

   This case is not about racial animus or retaliation, but rather a case is about an employee

who alleges discrimination and harassment without evidence to support his assertions of

discrimination.  Thus his complaint must fail.  Plaintiff Lawrence Albert (hereafter "Albert") by

his own admission began working for the United States Department of Agriculture ("USDA") in

1980 as a Food Program Specialist, where he remained until 1994.  In 1995, Albert began

working in the Departmental Office of Civil Rights  (the predecessor office to the Office of the

Assistant Secretary for Civil Rights) as an Equal Employment Specialist on a temporary detail.

In this position, Albert was responsible for counseling potential complainants on their options

within the Equal Employment Opportunity ("EEO") realm.  After the detail ended, the

Department hired Albert as an Equal Opportunity Specialist, GS-13, in the Department's Civil

Rights Office.  In 2000, Albert was assigned to a detail in the Office of Civil Rights' Conflict

Prevention and Resolution Center ("CPRC") (the predecessor office for the former Early

Resolution and Conciliation Division ("ERCD")).  While Albert was on detail at CPRC, the

Director of CPRC, Jeff Knishkowy, hired him in a permanent position.  After Mr. Knishkowy

left his position, Sheila Walcott, became the Acting Director of what was now known as ERCD.

Ms. Walcott explained to Albert that cases were assigned in three ways: self-generated, phone

call contact and assignment by the supervisor.  Walcott believed that Alternative Dispute

Resolution ("ADR") was cultivated through relationships forged with other Agencies and

emphasized this belief to her staff.  Albert alleges he was not assigned as many cases as Anita

Pitchford, (African-American female), because she was being groomed for the position which

she was later selected for by interview panel in 2014.  However, Walcott testified Albert did not

generate any work and did not build relationships with other agencies, therefore, his pool of

contacts was not as robust as that of his co-worker, Pitchford.  Further, Albert stated he did not

consider building relationships with other agency representatives "appropriate" because he

prided himself on being a "neutral" and he did not want the appearance of having an interest in

any outcome.  ADR by its very nature is about building trust and a rapport; therefore, Albert

misunderstood the very nature of the field in which he was employed, and that misunderstanding

may provide context why Albert did not have as many cases as Pitchford.

Additionally, when Walcott asked her employees in staff meetings if anyone would like

to volunteer to assist her with "facilitation" or program cases, Albert never volunteered.

November 27, 2018 Deposition of Lawrence Albert ("Second Albert Depo.") at 102-103.

Therefore, Albert was not discriminated against because of his protected bases, but he in fact

declined to participate in the work being offered.  In June 2011, the Agency sent Albert on a

detail to the Employee Complaints Division ("ECD") of the now-named Office of the Assistant

Secretary for Civil Rights.  Albert alleges he was sent to that office so that Pitchford could be

further groomed for her current position while he was sent away.   However, the Agency needed

to reduce and better manage EEO complaints and processing and this was explained to Albert in

the letter he received detailing him to ECD.  Further, because of Albert's past experience as an

EEO counselor, the Agency needed his skills to assist with the mandate made by the Secretary of

Agriculture.

　　　Albert's detail to ECD was housed in another building, known as the Reporters Building.

While on detail, Albert requested his supervisor, Walcott to provide his personal work computer

he was utilizing in ERCD.  Walcott personally drove the computer to Albert's detail site.  Upon

his return to ERCD, Albert wanted his computer returned to his desk and it took roughly two

weeks for the computer to be returned because an employee who was currently utilizing the work

station was also using the computer housed there.  A computer was provided for Albert in the

interim and the Agency returned his computer to him.

　　　 In October 2012, Albert received a "Superior" overall rating in his performance

evaluation, for the evaluation period of October 1, 2011 through September 30, 2012.  Walcott

explained to Albert that if he wanted to be rated "Outstanding," he would have to work outside

of his comfort zone.  Albert adhered to Walcott's guidance and in the following evaluation

period, he received an "Outstanding" performance rating.  As illustrated by the alleged incidents,

Albert fails to show how the alleged incidents are related to *any* of his protected bases.  There

cannot be disparate treatment when all personnel are treated equally.  The Agency did not treat

Pitchford more favorably than Albert.  Ms. Pitchford handled more work in the office because

Albert refused to handle more than a few cases at one time, declining to volunteer to take cases.

On or about August 2, 2012, Albert learned he was going to be transferred from ERCD to another position. Albert alleges he contacted Winona Scott and was advised he was one of the individuals selected to be transferred to another position. Albert states he informed Scott that he did not want to be transferred and had not asked to be transferred. Although Albert had requested to be transferred out of ERCD in the past, Albert only indicated he wanted to be transferred out of ERCD when there was a rumor that ERCD would be disbanded. When Albert objected to transfer to another position of ERCD, Albert was not transferred. This is a non-issue since Albert was never transferred out of ERCD.

Albert further alleges he was discriminated against as it relates to his non-selection of Vacancy Number AG-OASCR-2014-0199MP. However, a review of the scoring sheets shows Albert did not score as high as his counterparts, Pitchford and Edward Profit, and the selecting official, Mr. Salazar, whom had only been with the Agency approximately six (6) months prior to the selection, chose the candidates with the highest scores. Further, Salazar received guidance from the National Finance Center, Human Resources personnel in developing the interview process. And despite what is alleged by Albert, Salazar did not discuss any part of the process with Dr. Joe Leonard, Jr., the former Assistant Secretary for Civil Rights, or any other individual to include panel members on how any candidate should be rated. Further, because Salazar was a new employee in OASCR, he was not aware of Albert's prior EEO activity. The Agency did not select Albert for the GS-14, ADR Specialist position, because he could not convey to the panel how he was best suited for the position. The panel scored him without conferring with one another and gave their scores to the selecting official, Salazar. Albert did not score high enough to place third amongst the seven candidates. Therefore, despite his many years of experience

working in ADR, he was not selected because he failed to show he was demonstrably superior to the other candidates interviewed.

Lastly, Albert alleges discrimination and harassment in his receipt of a "Superior" performance rating in FY 2015. Salazar attested he initially gave all of his employees an "Outstanding" rating. After a direction given by OASCR that all managers review their performance evaluations and rate them appropriately, Salazar changed Albert's and all other employees' performance evaluations from "Outstanding" to "Superior" with one exception, the Administrative Assistant, Tonya Rucks-Bracey. Finally, based on the facts of the case and the failure of Albert to provide any evidence to support his allegations, the Court should enter judgment in favor of the Agency and dismiss this case with prejudice.

## II.   FACTUAL BACKGROUND

1.      At the time of his filing, Plaintiff Albert was employed as a Program Specialist with the USDA, OASCR, ERCD, Grade GS-13, located in Washington, D.C.  *See* First Report of Investigation ("First ROI") at 1 (Exh. 1, p. 00001).[1]

2.      Albert began his career with USDA as a Food Program Specialist with the Food and Nutrition Service ("FNS") in 1980 and remained in that position for 14 years until 1994.  *See* March 23, 2016 Deposition of Lawrence Albert ("Albert Depo.") at 10.

3.      In January 1995, Albert was assigned to a 10-month detail to the Department Civil Rights office as an Equal Employment Specialist. *See* Albert Depo. at 11.

4.      After the detail, Albert was hired as an Equal Employment Specialist, GS 13, where he remained until March of 2000.  *Id.*

---

[1] Excerpts from the First ROI are being provided as Exhibit A.  Excerpts from the Second Report of Investigation ("Second ROI") are being provided as Exhibit B.

5.      In 2000, Albert was assigned to a detail to the Conflict Prevention and Resolution Center ("CPRC"), the predecessor office to ERCD and hired by Jeff Knishkowy (Caucasian, Male, Jewish, over 40), the new director of the office.  *See* Walcott Depo. at 88-90; *see also* Albert Depo. at 13-14.

6.      Albert did not compete for this position.  *See* Albert Depo. at 14.

7.      Albert has participated in the training of Department agencies in Alternative Dispute Resolution ("ADR"), which began with his former supervisor, Sheila Walcott, (African American, female, over 40) and former Program Manager, of ERCD.  *See* Albert Depo. at 15.

8.      Mr. Knishkowy remained the Director of the ERCD office until Ms. Walcott became the Acting Director. After his departure from ERCD, Mr. Knishkowy worked as a GS-15, Senior Advisor in Dr. Joe Leonard's (former Assistant Secretary for Civil Rights) front office. *See* Leonard Depo. at 134; Walcott Depo. at 21-23.

9.      While under the supervision of Sheila Walcott in ERCD, cases were assigned in three ways, self-generated, phone call contact and assignment by the supervisor. Walcott attests that ADR is cultivated through relationships forged with other Agencies and the business of ERCD is "customer driven." *See* First ROI at 000254 (Exh.8 p. 000254).

10.     Ms. Walcott placed Albert on a Lean Six Sigma Group while she was his supervisor.  *See* Albert Depo. at 17.

11.     Albert believes and has attested that he is a neutral and does not believe in building relationships with people in other Agencies to create ADR business.  *See* Albert Depo. at 43-44.

12.     Albert alleges that Ms. Pitchford was "groomed" to be selected for the position of ADR Specialist, GS14, the position for which he interviewed, but was not selected in September 2014.  *See* Albert Depo. at 26.

1.     13.     In ERCD under the supervision of Ms. Walcott, cases were generated in three ways by walk-in, phone calls or self-generated through networking with other agencies. *See* First ROI at 000254 (Exh. 8 p. 000254); Albert Depo. at 33-34.

2.     14.     On occasion, after speaking with Albert, potential clients would call the main office and ask to speak with another specialist. *See* First ROI at 000271 (Exh. 11 p. 000271); *see* also Albert Depo. at 35-38.

15.     Albert attested that Ms. Walcott did not use the word "no" when he inquired about program cases. *See* Albert Depo. at 29-31.

16.     Albert was assigned to a detail with the Office of Adjudication effective June 27, 2011 because of Plaintiff's prior experience working as an EEO counselor. *See* First ROI at 000260 (Exh.8 p. 000260) and First ROI at 000283 (Exh. 14 p. 000283).

17.     During FY 2009, Albert received a "Superior" performance rating. Albert alleges he received this rating because he is being discriminated against. *See* Albert Depo. 54-58.

18.     During FY 2009, Ms. Pitchford, also received a "Superior" performance rating. *See* First ROI at 000288 (Exh.16 p. 000288).

19.     During FY 2010, both Albert and Ms. Pitchford received a "Superior" rating. *See* Albert Depo. at 59; *see also* First ROI at 000289 (Exh.16 p. 000289).

20.     In July 2011, Albert learned he would be reassigned. At that time, Albert spoke with Winona Scott, Associate Assistant Secretary for Civil Rights and expressed that he did not wish to be reassigned. Thereafter, Albert was not reassigned. *See* Albert Depo. 62-63.

21.     Albert has sought counsel and advice in the past on how he could improve upon his training and presentation. Scaggs Depo. at 31-32.

22.     Albert was assigned to a detail to the Office of Adjudication effective June 27, 2011, because of his degree in English and his prior experience working as an EEO counselor, *See* First ROI at 000260 (Exh. 8 p. 000260) and First ROI at 000283 (Exh. 14 p. 000283).

23      During Albert's detail, Ms. Walcott drove his computer in her personal vehicle for Albert to use while on his detail. *See* Albert Depo. at 61-62.

24.     Cyrus Salazar, (Caucasian, Hispanic, male, Over 40), GS 15, became the Director of ERCD and Albert's immediate supervisor, on January 26, 2014; prior to this date, Mr. Salazar was not employed by USDA in any capacity. *See* Salazar Depo. at 12.

25.     Mr. Salazar was not aware of Albert's prior EEO activity. *See* Second ROI at 000110) (Exh. 7 p. 000110).

26.      Albert applied for Vacancy Number AG-0ASCR-2014-0199MP for the position of ADR Specialist, GS 14. *See* Second ROI at 000089 (Exh. 6 p.000089).

27.     Albert was determined to be "qualified" by Human Resources and was interviewed by a panel in August 2014 for Vacancy Number AG-0ASCR-2014-0199MP. *See* Second ROI at 000090 (Exh. 6 p. 000090).

28.     Albert was not selected by Cyrus Salazar, the selecting official, based upon the scoring of the panel, which was comprised of William Scaggs, (White, Male. Methodist), GS-14; Alicia Rodriguez, (White, Hispanic, Catholic, Over 40), GS-14; and David King (African American, Male, Over 40), Senior Executive Service.  Salazar Depo. at 77-79.

29.     Albert alleges that he was not selected for the position because of his race, color, age, sex and religion. *See* Second ROI at 000091 (Exh. 6 p. 000091).

30.     On November 3, 2014, Albert's Performance Evaluation was changed from an initial "Outstanding" to "Superior" from his supervisor, Cyrus Salazar. *See* First ROI at 000118 (Exh. 8 p. 000118).

31.     Regarding Albert's performance evaluation, Mr. Salazar was adhering to a mandate that all supervisors review their performance evaluations and make changes where necessary. *See* Second ROI at 000141 (Exh. 9 p. 141).

32.     In addition to Albert's performance evaluation, Mr. Salazar changed all employees' performance evaluations in ERCD to "Superior" except for the Administrative Assistant. *See* Second ROI at 000118 (Exh.7 p. 000118).

33.     Mr. Salazar addressed the changes to the evaluations when he met with his subordinates, to include Albert. *See* Albert Depo. at 68.

34.     Albert alleges the Agency subjected him to discrimination on the bases of sex, (male), race (white), age (born 1952), religion (Jewish), and Reprisal (prior EEO activity)/Terms and Conditions of Employment, Training, Appraisal/Evaluation, Reassignment (directed), Harassment (non-sexual).  *See* Complaint at 12-19.

## III.     STANDARD OF REVIEW

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  *Liberty Lobby, Inc.*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Holcomb*, 433 F.3d at

895. When Rule 56 is invoked, the moving party has the initial burden of demonstrating the

absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). When the moving party does not bear the burden of persuasion at trial, its burden

"may be discharged by 'showing'—that is, pointing out to the district court—that there is an

absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party, to defeat the motion,

must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation

omitted).  Though courts must view this evidence in the light most favorable to the nonmoving

party and draw all reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of*

*Governors, Chairman*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the nonmoving party must show

more than "[t]he mere existence of a scintilla of evidence in support of" his position—"there

must be evidence on which the jury could reasonably find for [the nonmoving party]." *Anderson*,

477 U.S. at 252. The nonmoving party, moreover, "may not rest upon mere allegation or denials

of his pleading but must present affirmative evidence showing a genuine issue for trial."

*Laningham v. U.S. Dep't of the Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal citation

and quotation marks omitted).

## IV.    ARGUMENT

### A.    The *McDonnell Douglas* Burden Shifting Framework Applies to all of Albert's claims.

Albert's Counts I, II, III, IV and V allege that the Agency subjected Albert to discrimination,

harassment and reprisal because of his race, color, sex, religion, age and prior EEO activity: 1.)

in the assignment of cases while he worked in the Early Resolution and Conciliation Division

("ERCD") of the Office of Assistant Secretary for Civil Rights ("OASCR"); 2.) when Plaintiff

became aware that Dr. Leonard considered reassigning Albert to the Conflict Services Division.

3.) in the assignment of a detail to the Employment Complaints Division in June of 2011; 4.)
Albert was not provided a computer when he went on detail, so he asked for and received his
computer from ERCD; 5.) in the invitation to attend Holocaust Remembrance Day; 6.) in
September 2014, Plaintiff Albert was not selected for either of two subject positions of a GS-
0301-14, Dispute Resolution Specialist position, Vacancy Announcement No.AG-OASCR-2014-
0199MP.  *See* Compl. Count I, II, III, IV, and V.  A plaintiff can use the *McDonnell-Douglas*
framework to establish liability.  Under this framework, for disparate treatment claims, the
plaintiff bears the burden of establishing a *prima facie* case of discrimination by showing that (1)
he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the
unfavorable action gives rise to an inference of discrimination.  *Taylor v. Small*, 350 F.3d 1286,
1292 (D.C. Cir. 2003) (citing *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002)); *see Clayton
v. District of Columbia,* ___ F. Supp. 3d ___, 2015 WL 4639558 (Aug. 4, 2015 D.D.C. 2015)
(Moss, J.) (applying the burden shifting framework for disparate treatment claims under Title
VII); *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying the *McDonnell Douglas*
framework to an action under the Age Discrimination in Employment Act ("ADEA") and noting
that the plaintiff bears the ultimate burden of proving that discriminatory animus was the
determining or but-for cause of the personnel action); *Krodel v. Young,* 748 F.2d 701, 705 (D.C.
Cir. 1984) (applying *McDonnell Douglas* to ADEA cases); *see also Forman v. Small,* 271 F.3d
285, 292 (D.C. Cir. 2001) (plaintiff may satisfy his burden "either indirectly by showing the
employer's reason is pretextual or directly by showing that it was more likely than not that the
employer was motivated by discrimination.").   Moreover, "[a]n employer may cure an adverse
employment action ... before that action is the subject of litigation," but the D.C. Circuit has
found such "cure" only where an employer takes actions that completely undo the effects of the

alleged adverse action. *See Taylor v. Small,* 350 F.3d at 1293; *see also White v. Burlington N. & Santa Fe Ry. Co.,* 310 F.3d 443, 452 (6th Cir. 2002) (cited approvingly by the D.C. Circuit in *Taylor v. Small* for the proposition that a reinstatement that "puts the plaintiff in the *same position she would have been in* absent [a] suspension ... negat[es] a potentially adverse ... employment decision" (emphasis added)); *Benningfield v. City of Houston,* 157 F.3d 369, 378 (5th Cir.1998) (cited approvingly in *Taylor v. Small* for the proposition that "[w]e need not address whether a mere delay in promotion constitutes an adverse employment action because [plaintiff] received the promotion *with retroactive pay and seniority*" (emphasis added)).  In *Taylor,* the court found that a denial of a bonus was "cured" when the employer paid the bonus. *Id.* at 1294.  For a retaliation claim, the plaintiff must allege that (1) he engaged in an activity protected by Title VII, (2) the employer took adverse action against him, and (3) the employer took that action because of the employee's protected conduct.  *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012); *see also Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (applying the burden shifting framework for retaliation claims under Title VII).

If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action.  *McDonnell Douglas*, 411 U.S. at 802.  Once it is established that the parties have met their respective burdens, the *McDonnell Douglas* framework disappears and "the sole remaining issue is discrimination *vel non*."  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (internal citations omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

The D.C. Circuit refined the application of the *McDonnell Douglas* framework in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), holding that where an employee has suffered an adverse employment decision and the employer has articulated a legitimate non-discriminatory reason for its actions, the court "need not -- *and should not* -- decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*." *Id.* at 494 (emphasis in original). The court must instead focus on one central question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer "intentionally discriminated" against the employee." *Brady*, 520 F.3d at 494; *Moktar*, 2015 WL 1138454, at 13 and n. 15 (Contreras, J.) (applying the *Brady* principle in Title VII cases); *Jones*, 557 F. 3d at 678 (applying *Brady* in retaliation cases). An employer's asserted reason "cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515 (emphasis in original). "It is not enough, in other words, to disbelieve the employer, the fact finder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 519. *See also Allen v. Johnson* ___ F.3d ___, 2015 WL 4489510, 3 (D.C. Cir. July 24, 2015).

Within this burden-shifting framework, where there is no direct evidence of discrimination by the selecting official, as here, to prevail on a relative qualification claim, Albert must show that he is "significantly better qualified for the job" than Pitchford and Profit, the applicants ultimately chosen. *Grosdidier v. Broadcasting Bd. of Governors*, 709 F.3d 19, 29 (D.C. Cir. 2013) (citing *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008)). The qualifications gap must be "great enough to be inherently indicative of discrimination" or retaliation. *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007). In that vein, a disparity in

qualifications, standing alone, can support an inference of discrimination or retaliation only when the plaintiff is "markedly more qualified," "substantially more qualified," or "significantly better qualified" than the successful candidate. *Holcomb v. Powell*, 433 F. 3d 889, 897 (D.C. Cir. 2006) (internal citation omitted). More importantly, Albert's own assessment or perception of his purportedly superior qualifications is irrelevant. *Jo v. District of Columbia*, 582 F. Supp. 2d 51, 62-63 (D.D.C. 2008) ("Although Plaintiff clearly values his own credentials and experiences, a plaintiff's subjective assessment of his own record is largely irrelevant"). Otherwise, absent evidence of pretext or discriminatory/retaliatory motive, the court "must respect the employer's unfettered discretion to choose among qualified applicants." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Once the agency has carried the burden of production on an issue of legitimate non-discriminatory reason for its action, the *McDonnell Douglas* framework is no longer relevant, and the presumption raised by the *prima facie* case is rebutted, and drops from the case. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (*quoting Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 and n.10 (1981) (internal citations omitted)); *see also Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C. Cir. 2006) (affirming grant of summary judgment for employer where the plaintiff failed to rebut legitimate non-discriminatory reason for employment action). It is then incumbent upon the plaintiff to prove that the agency's legitimate, non-discriminatory reasons were not its true reasons but rather were pretextual. *Id.; see McDonnell Douglas*, 411 U.S. at 802-04; *Burdine*, 450 U.S. at 252-53. The plaintiff bears the ultimate burden of persuasion on the issue of whether he was intentionally discriminated against. *Burdine*, 450 U.S. at 253. The plaintiff must present evidence on which the jury could infer discrimination from the combination of "(1) evidence establishing the plaintiff's prima facie

case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 443 F.3d 889, 897 (D.C. Cir. 2006) (*citing Aka v. Wash. Hosp. Ctr.*, 156 F.3d at 1289). *See also Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005) ("This boils down to two inquiries: could a reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the jury infer that this pretext shielded discriminatory motives?"); *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008) (affirming grant of summary judgment where the plaintiff did not produce evidence sufficient to show that the defendant's conclusion was dishonest or unreasonable).

"Under Title VII, an individual suffers disparate treatment 'when he or she is singled out and treated less favorably than others similarly situated on account of [gender].' " *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1121 (9th Cir.2004) (quoting *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir.1988)). "Disparate treatment claims must proceed along the lines of the praxis laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny." *Bodett v. Coxcom, Inc*., 366 F.3d 736, 743 (9th Cir. 2004). The *McDonnell Douglas* analysis requires a plaintiff first to establish a prima facie case of discrimination. "Although [the] specific method for appropriately establishing a prima facie case will vary depending on differing factual situations ... [i]n general, a plaintiff must present evidence of actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such action was based upon race or another impermissible criterion." *Bankhurst v. Johanns*, 2008 WL 4826278 (D.Or) (November 3, 2008).

Defendant submits that, based on an objective assessment of the <u>facts</u> (not opinions) that Plaintiff puts forth, Plaintiff's claims are subject to summary judgment in favor of the Defendant. Albert asserts in his complaint, that given his vast experience in the ADR field and by his experience alone, he should have been selected for the GS-0301-14, Dispute Resolution Specialist position offered under the vacancy announcement.  However, the three interview panel members rated Albert at the low end of the seven potential candidates.  In the case of panel member Scaggs (Caucasian, male, Methodist, over 40) Albert was tied for 5th place out of 7 candidates.  ROI Exh. 24 p. 264.  Panel member Rodriguez (Caucasian, female, Hispanic, Catholic, over 40), ranked Albert 6th of 7 candidates. ROI Exh. 23 p. 255. And in the case of panel member King, (African American, male, over 40, no religious preference) Albert was ranked number 4 of 7.  ROI Exh. 22 p. 246.  Albert alleges that the panel should have taken his application and work history into consideration when making the selection and not base the selection on which candidate scored the highest during the interview; however, it is entirely reasonable for the employer to make a final decision based on personal interviews.  *Fischbach*, 86 F.3d at 1184.  Further, the court may not substitute its judgment for that of the employer regarding an applicant's qualifications, unless the evidence shows that the plaintiff was significantly better qualified than the selectee for the position.  *Ford v. Mabus*, 629 F. 3d 198, 203 (D.C. Cir. 2010).  To do otherwise, the court would sit as "the judiciary [] super-personnel department" that re-evaluates the agency's business decisions.  *Jackson*, 496 F.3d at 707.  The D.C. Circuit has counseled against courts assuming this role.  *Id.; see Fischbach*, 86 F. 3d at 1183 (noting that "[s]hort of finding that the employer's stated reason was indeed a pretext; however – and here one must be aware of using 20/20 hindsight – the court must respect the employer's unfettered discretion to choose among qualified candidates.").

-16-

**B.      The Agency Had Legitimate, Non-Discriminatory Reasons for Albert Not Being Assigned Cases, His Potential Reassignment, Albert's Detail, Albert's Computer, 2011 Performance Evaluation, and His 2015 Performance Evaluation**

### 1.      Assignment of Cases/Facilitation

In the instant matter, Albert alleges that because he is a Caucasian, Jewish, white male, over 40 and engaged in prior EEO activity, he was being discriminated against by the Office of the Assistant Secretary for Civil Rights ("OASCR") in regard to his assignment of duties, his performance evaluations, a detail assignment, a purported reassignment and a non-selection. However, this notion has been refuted by the testimony of his former ERCD supervisor, Ms. Walcott, former supervisor, Mr. Salazar and his co-workers.  *See* ROI Exh. p.6 p.000235; ROI Exh. 8 pp. 000254-000255; *see also* Salazar Depo. p. 126.  The Office of Early Resolution and Conciliation Division ("ERCD") during Ms. Walcott's time as Program Manager under the supervision of Jeff Knishkowy, generated work in three ways: self -generated, phone call contact and assignment by the supervisor. *See* ROI Exh. Exh.8 p. 000254.

Albert alleges that he was not assigned as many cases as Ms. Pitchford, an African American female, because she was being groomed for the position which she was selected for by interview panel in 2014. *See* ROI Exh. 6 pp. 000235-000236.  However, his former supervisor testified that Albert did not generate any work and did not build relationships with other agencies, therefore, his pool of contacts was not as robust as that of his co-worker, Ms. Pitchford. *See* Walcott Depo. at 71& 93; *see also* ROI Exh. 8 p. 000254-000255.  Further, Albert attested in his own deposition that he does not consider building relationships with other agency representatives "appropriate" because he prides himself in being a "neutral" and he does not want to make the appearance of him having an interest in any outcome. *See* Albert Depo. pp. 36-

37. ADR by its very nature is about building trust and a rapport. *See* ROI Exh. 8 p. 000254; ROI p. 254-255.

Additionally, when Ms. Walcott asked her employees in staff meetings if anyone would like to volunteer to assist her with "facilitation" or program cases, Albert never volunteered. *See* ROI Exh. 8 p. 000256; *see also* Walcott Depo. at 29; *see* Second Albert Depo. at 102-103. Therefore, Albert was not discriminated against because of his protected bases but because he declined to participate in work being offered and because he was not deemed the best qualified for promotion based on the interviews.  Further, Albert's colleague Mr. Profit testified that he has asked Albert for assistance with his Title VI program cases and Albert has refused, illustrating Albert's unwillingness to learn or receive guidance which could enhance his abilities and knowledge *See* Profit Depo. at 75-76

### 2.     Albert's Reassignment

On or about August 2, 2012, Albert learned that he was going to be transferred from ERCD to another position. Albert alleges he contacted Winona Scott and she advised him that he was one of the individuals selected to be transferred to another position. *See* ROI Exh. 6 p. 00237. Albert states that he informed Ms. Scott that he did not want to be transferred and had not asked to be transferred. *Id*. Although Albert had previously requested to be transferred out of ERCD in the past, he states he only indicated that he wanted to be transferred out of ERCD when there was a rumor that ERCD would be disbanded. *See* ROI Exh. 6 p. 000237. After hearing that he did not want to be transferred to another position of ERCD, Albert was not transferred. This is a non-issue since Albert was not transferred out of ERCD. *See* Albert Depo. at  63.

### 3.    Albert's Detail

In June 2011, the Agency assigned Albert to a detail to the Employee Complaints Division. Albert alleges he was sent to that office so that Ms. Pitchford could be further groomed for her current position while he was sent away. *See* ROI Exh.14 p. 000283.  In reality, the Agency contends the Employee Complaints Division ("ECD") needed to reduce and better manage EEO complaints and processing.  Therefore, as a result of Albert's past experience as an EEO counselor and his Bachelor's Degree in English, the Agency determined that his skills were needed to assist with this mandate made by the Secretary of Agriculture. *See* Second Albert Depo. at 21-23.

### 4.    Albert's Computer

Albert's detail to the Employee Complaints Division Unit was housed in another building, other than his normal duty station known as the Reporters Building. *See* Albert Depo. 60-61.  While on detail, Albert requested his supervisor, Ms. Walcott to provide his personal work computer he was utilizing in ERCD. *See* ROI Exh. 6 p. 000238.  Ms. Walcott personally drove the computer to Albert's detail site. *Id*.  Upon his return to ERCD, Albert wanted his computer returned to his desk and it took roughly two weeks for the computer to be returned because an employee who was currently utilizing the work station was also using the computer housed there. *Id*.  A computer was provided for Albert in the interim and Albert's computer was returned to him. *See* ROI Exh. 8 p. 000257; Albert Depo. at 60-61.

Such action does not support a claim under federal anti-discrimination laws, because the delay was not occasioned by any unlawful motive, because the delay (coupled with the availability of a different computer for a matter of weeks) did not amount to an adverse action,

and because the computer was returned before this action was commenced.  *See Taylor v. Small,* 350 F.3d at 1293; *White v. Burlington N. & Santa Fe Ry. Co.,* 310 F.3d at 452.

     **5**.      **Albert's 2011 Performance Evaluation**

In October 2012, Albert received a "Superior" overall rating in his performance evaluation, for the evaluation period of October 1, 2011 through September 30, 2012.  *See* ROI Exh. 16 p. 000288.  However, Ms. Walcott, explained to Albert, that if he wanted to be rated "Outstanding" there were certain types of initiative he would have to work on outside of his comfort zone. *See* ROI Exh. 8 p. 000258.  During the following performance period, Albert adhered to Ms. Walcott's guidance and when rated, Albert received an "Outstanding" performance rating. *See* ROI Exh. 8 p. 258.

     **6.**  **Albert's 2015 Performance Evaluation**

Albert alleges discrimination and harassment in his receipt of a "Superior" performance rating in FY 2015.  However, Albert also alleges other purported reasons for performance such as being absent from work. *See* ROI Exh. 16 p. 000207-209.  Albert's supervisor, Mr. Salazar attested that he initially gave all of his employees an "Outstanding" rating and after a mandate given by OASCR that all managers review their performance evaluations and rate them appropriately.  After reviewing his subordinate's evaluations, Mr. Salazar changed Albert's and all other employee's performance evaluations from "Outstanding" to "Superior" with one exception, the Administrative Assistant, Ms. Rucks-Bracey. *See* ROI Exh.7 p.000118.

As illustrated by the alleged incidents, Albert fails to show how the alleged incidents are related to any of his protected bases. There cannot disparate treatment where it appears all personnel are treated equally.

C.    **The Agency Has Legitimate, Non-Discriminatory Reasons For Not Selecting Albert Because Pitchford and Profit Had Superior Interviews (Count V)**

Albert alleges he was discriminated against because of his protected classes in connection with his non-selection under Vacancy Number AG-OASCR-2014-0199MP. However, it is clear that Albert did not score as high as his counterparts, Anita Pitchford and Edward Profit, and the selecting official, Mr. Salazar, who had only been with the Agency approximately 6 months prior to the selection, (*See* Salazar Depo. at 74-75) chose the candidates with the highest scores. *See* Salazar Depo. at 137; *see also* ROI Exh. 22 p. 000246; Exh. 23 p. 000255 and Exh. 24 p. 000264. However, Mr. Salazar received guidance from the National Finance Center, Human Resources personnel in developing the interview process. *See* Salazar Depo. at 73 & 76 Further, despite what is surmised by Albert, Mr. Salazar did not discuss any part of the process with Dr. Joe Leonard, Assistant Secretary for Civil Rights (*see* Salazar Depo. at 116) or any other individual to include panel members on how any candidate should be rated. *See* ROI Exh. 10 p. 7 of 11; Salazar Depo. at 108-109; 156-157.

### 2.    There Is No Evidence of Discrimination.

At his deposition, when asked for further evidence of unlawful conduct, Albert repeated that he was the only white, male, Jewish candidate. However, Albert also admitted that he was only aware of four of the candidates' races and sexes and he was not familiar with the races and the sexes of all of the candidates.  Albert Depo. at 67.  Further, there is no evidence of the selections of Pitchford and/or Profit being made because they are African American or their religion or for any other discriminatory reason.  All of the panel members attest that they scored the candidates based upon their interviews and Mr. Salazar selected the candidates with the highest scores.

### D.    Albert Fails to Make a Case for Hostile Environment Harassment

To establish a claim of hostile environment harassment, Albert must show that  (1) he

belongs to a statutorily protected class: (2) he was subjected to harassment in the form of

unwelcome verbal or physical conduct involving the protected class; (3) the harassment

complained of was based on his statutorily protected class; (4) the harassment affected a term or

condition of employment and or had the purpose or effect of unreasonably interfering with the

work environment and or creating an intimidating, hostile, or offensive work environment; and

there is the basis for the imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th

Cir. 1982).  An "objectively hostile or abusive work environment [is created when] a reasonable

person would find [it] hostile or abusive" and the Plaintiff subjectively perceives it as such.

*Harris v. Forklift Sys*., 510 U.S. 17, 21-22 (1993).  A single incident or group of isolated

incidents will generally not be regarded as discriminatory harassment unless the conduct is

severe. *Walker v. Ford Motor Co*., 684 F.2d 1355, 1358 (11th Cir. 1982).  The trier of fact

considers the frequency of the discriminatory conduct, its severity, whether it is physically

threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes

with an employee's work performance. *Harris v. Forklift Sys*., 510 U.S. at 23.

Moreover, a plaintiff is required to timely exhaust administrative remedies within 45 days

of the events that are deemed discriminatory.  Plaintiff was not timely in complaining about the

dissimilar slights about which he now complains that took place more than 45 days preceding his

initial contact with an EEO counselor (*i.e.*, before May 14, 2012).[2]

---

[2] The earliest reference that Plaintiff sought counseling in the EEO matters at issue is his date of contact with the EEO office on June 28, 2012, wherein he complained about events as far back as 2009.  *See* First ROI at 00024-27, 00032, 00040; Complaint, ¶¶ 33,  38, 42 (complaining about performance appraisals from years before 2012 and a six-month detail that began in June

Title VII plaintiffs must timely exhaust their administrative remedies before suing in federal court. *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010). This requires two steps. Prospective plaintiffs must first initiate contact with an EEO counselor within forty-five days of the alleged discriminatory action, or for a personnel action, within forty-five days of its effective date. 29 C.F.R. § 1614.105(a)(1). If that informal counseling proves unsuccessful, the plaintiff must file a formal complaint with the agency that allegedly discriminated against her. Id. § 1614.106(a).

The first step—informal counseling within forty-five days—is an important one: "[A] court may not consider a discrimination claim that has not been exhausted in this manner absent a basis for equitable tolling." Steele v. Schafer, 535 F.3d 689, 693 (D.C. Cir. 2008). But the exact contours of that rule have not been fully determined in this Circuit. It used to be settled that "[a] Title VII lawsuit following the EEOC charge [wa]s limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations," *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotations and citation omitted)—thus affording some consideration to claims that were not, themselves, precisely exhausted.

Since then, however, the Supreme Court has held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  That is, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* But it is unclear how broadly *Morgan's* holding cuts—and whether, for instance, that holding requires that discrete discriminatory acts alleged in timely filed charges must also have—individually—been submitted for a prior (and timely) discussion with an EEO counselor. *See Payne*, 619 F.3d at 65 ("We need not decide whether Morgan did in fact overtake that line of cases [allowing employees to litigate unfiled claims that are like or reasonably related to those they did file] ...."); *see also, e.g., Rashad v. Wash. Metro. Area Transit Auth.*, 945 F. Supp. 2d 152, 166 (D.D.C. 2013) (noting split among district courts in this Circuit, but commenting that most have found Morgan controlling); *Wade v. Dist. of Columbia*, 780 F. Supp. 2d 1, 14 (D.D.C. 2011) (noting split). *But see Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007) ("As [plaintiff] contacted his [EEO] Counselor regarding that memo [three days after receipt, given the forty-five day limit], this portion of [his] discrimination claim is not time-barred."); *Bell* [*v. Donley*], 724 F. Supp. 2d [1,] 10 [(D.D.C. 2010)] (dismissing claims for failure to initiate contact with EEO counselor within forty-five days).

*Howard v. Kerry*, 85 F. Supp. 3d 428, 433 (D.D.C. 2015).

---

2011); *see also* Second ROI at 51-55 (Plaintiff first sought counseling as to the non-selection on September 8, 2014).

Here, Plaintiff appears to attempt to bring in several events that took place well before May 15, 2012, and apparently seeks to employ a theory of a Hostile Work Environment to do so. *See* Complaint, ¶¶ 11, 33-34, 38-44.   His allegations fail to make out the requisite standard for a hostile work environment and are not related in any significant way.   Accordingly, those claims that Plaintiff never timely brought to the attention of an EEO officer should be dismissed.

**1. Invitation to the Holocaust Museum for a Private Tour and Remembrance Day**

Albert alleges that he was harassed and discriminated by Assistant Secretary for Civil Rights Leonard when he invited him and others on a private tour given by the former General Counsel of the Holocaust Museum, in Washington, D.C. and the current USDA Ethics Officer, Stuart Bender. *See* Leonard Depo. at  127-132; Second Albert Depo. at 72-74, 114-115.   Dr. Leonard attested that he is a historian and thought Mr. Albert would enjoy a private tour led by Mr. Bender depicting the nuances not commonly available on larger scaled tours. *Id.*   However, Albert alleges that he was offended by this gesture because he sits on the "Board" of the Holocaust museum and Dr. Leonard should have known that he did not need a "tour" but perhaps someone who is not familiar with Jewish history should have been invited. Albert Depo. at 72-77.   Similarly, Albert was offended when Mr. Salazar invited him to the Holocaust Remembrance Day held at the theater. *Id.*   Still, Albert admitted that Dr. Leonard, himself, went on the tour, that the leader of the tour did provide insight into the materials in the lobby of the museum containing artifacts and other significant items that Albert was interested in.  Second Albert Depo. at 72, 114-15.   And, Albert admits that he did not view the tour as any form of punishment, but simply noted that he and other Jewish employees had been singled out for the tour.  Second Albert Depo. at 114.   Finally, Albert admits that he was not required to apply for leave to attend the tour.  Second Albert Depo. at 73.   Hostile work environment claims "involve

repeated conduct" and "are based on the cumulative effect of individual acts." *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. at 115.  In pleading a hostile work environment claim, a

plaintiff must allege facts showing that the "workplace [was] permeated with 'discriminatory

intimidation, ridicule, and insult' and that this behavior [was] "sufficiently severe or pervasive

[as] to alter the conditions of [her] employment and create an abusive working environment."

*Harris v. Forklift Sys.*, 510 U.S. at 21, quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57,

65, 67 (1986).  The acts that Albert details are not instances of harassment.  Rather, these

interactions are inoffensive work-related interactions.  Further, Ms. Walcott contends that Albert

did not volunteer for different cases, did not self-generate and was rated appropriately as

"Superior" in 2011. *See* ROI Exh. 8 p. 000254-000255; 000258; Second Albert Depo. at 102-

103; *Cooper v. Nielsen*, 298 F. Supp. 3d 197, 203-04 (D.D.C. 2018) (Plaintiff does not allege the

sort of severe and pervasive conduct that would support a claim of discrimination based on a

hostile work environment theory.  Indeed, he does not allege that any racially offensive remarks

were made to or about him or were directed towards anyone else.); *Nurriddin v. Goldin,* 382 F.

Supp. 2d 79, 108 (D.D.C. 2005), aff'd sub nom. *Nurriddin v. Griffin*, 222 Fed.Appx. 5 (D.C. Cir.

2007) (When discriminatory statements are not made directly to a plaintiff, generally a hostile

environment cannot be established.)

In the instant case, Albert fails to show a work environment permeated with

discriminatory intimidation, ridicule and insult.  Both his former supervisors, Walcott and Mr.

Salazar attested that Albert's performance evaluation's in 2011 and 2015 were based upon his

performance.  Further, Mr. Salazar attested in 2015, Albert was rated as "Superior" because of

the guidance he was given as a manager by his superiors, not specifically towards Albert, but for

all supervisors to review their evaluations and determine which employees actually were

"Outstanding".  Finally, regarding the non-selection, as previously stated, Albert did not score

high enough during his interview for the GS-14 ADR Specialist position, therefore the Selecting

Official, Mr. Salazar did not select him as he did not score within the top three scored candidates.

The harasser's conduct should be evaluated from the objective viewpoint of a reasonable person

in the victim's circumstance.  In this case, Albert and his supervisors and colleagues have had

numerous conversations with him that would be considered work place interactions.  Similarly,

any invitation to a Remembrance Day with Mr. Salazar or the Holocaust museum with Dr.

Leonard was purely a cultural sensitivity to Albert's and other employees' faith and culture and

not meant by any means to harass or discriminate against Albert. *See* Leonard Depo. at 127-132.

In fact, the Secretary of Agriculture has invited all agency employees to a Remembrance Day

event every year since 2009. Exhibit C.

### V. CONCLUSION

To avoid summary judgment, a Title VII Albert must produce objective evidence that the

asserted reasons are a mere pretext and that the defendant's actions were the product of

discriminatory intent. Albert cannot meet this burden. Based on the forgoing arguments the

Court should dismiss Albert's claims of discrimination because Albert cannot show that the

legitimate, non-discriminatory reasons the Agency has given for the assignment of cases, 2012

performance evaluation, detail to the Employee Complaints Division, purported reassignment,

his original work computer not being immediately returned after Albert's detail, non-selection

for the GS-14 position and the 2014 performance evaluation are mere pretext. Also, the evidence

demonstrates that Albert did not want to volunteer for any additional work, did not heed the

suggestions of his colleagues, did not perform his best in the interview for the GS-14 positions,

Albert has offered no evidence that the legitimate, nondiscriminatory reasons asserted by the Agency regarding the allegations are a pretext designed to mask discrimination on any basis.

Further, a single incident or group of isolated incidents will generally not be regarded as discriminatory harassment unless the conduct is severe would be considered severe or pervasive to be considered harassment under Title VII. Albert has failed to illustrate any actions taken against him that would be considered severe or pervasive. Therefore, Albert has not met his burden in any claim made against the Agency and a decision without hearing should be issued with respect to all allegations. For the foregoing reasons, the Court should grant summary judgment in the Agency's favor and dismiss this case with prejudice.

May 3, 2019                          Respectfully submitted,

                                     JESSIE K. LIU, DC Bar #472845
                                     United States Attorney

                                     DANIEL F. VAN HORN, DC Bar #924092
                                     Chief, Civil Division

                                     By:_____/s/
                                     W. MARK NEBEKER, DC Bar #396739
                                     Assistant United States Attorney
                                     555 4th Street, N.W.
                                     Washington, DC  20530
                                     (202) 252-2536
                                     mark.nebeker@usdoj.gov

Of counsel:

Stephanie Ramjohn Moore
Senior Counsel
U.S. Department of Agriculture
Office of the General Counsel
Civil Rights, Labor and Employment Law Division
1400 Independence Ave, SW Room 3320-S
Washington, DC 20250-1400

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAWRENCE ALBERT                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )          Civil Action No. 17-1572 JEB
                                   )
                                   )
SONNY PERDUE,                      )
   Secretary of Agriculture,       )
                                   )
            Defendant.             )
_____)

**STATEMENT OF MATERIAL FACTS AS TO
WHICH THERE IS NO GENUINE DISPUTE**

Defendant hereby proffers the following material facts as to which there is no genuine

dispute, pursuant to Local Civ. R. 7(h)(1):

3.      At the time of his filing, Plaintiff Albert was employed as a Program Specialist

with the USDA, OASCR, ERCD, Grade GS-13, located in Washington, D.C.  *See* First Report of

Investigation ("First ROI") at 1 (Exh. 1, p. 1).

4.      Albert began his career with USDA as a Food Program Specialist with the Food

and Nutrition Service ("FNS") in 1980 and remained in that position for 14 years until 1994.  *See*

March 23, 2016 Deposition of Lawrence Albert ("Albert Depo.") at 10.

5.      In January 1995, Albert was assigned to a 10-month detail to the Department

Civil Rights office as an Equal Employment Specialist. *See* Albert Depo. at 11.

6.      After the detail, Albert was hired as an Equal Employment Specialist, GS 13,

where he remained until March of 2000.  *Id.*

7.      In 2000, Albert was assigned to a detail to the Conflict Prevention and Resolution

Center ("CPRC"), the predecessor office to ERCD and hired by Jeff Knishkowy (Caucasian,

Male, Jewish, over 40), the new director of the office.  *See* Walcott Depo. at 88-90; *see also* Albert Depo. at 13-14.

8.     Albert did not compete for this position.  *See* Albert Depo. at  14.

9.     Albert has participated in the training of Department agencies in Alternative Dispute Resolution ("ADR"), which began with his former supervisor, Sheila Walcott, (African American, female, over 40) and former Program Manager, of ERCD.  *See* Albert Depo. at  15.

10.     Mr. Knishkowy remained the Director of the ERCD office until Ms. Walcott became the Acting Director, where she acted as Plaintiff's supervisor from March 2011 to December 2013. After his departure from ERCD, Mr. Knishkowy worked as a GS-15, Senior Advisor in Dr. Joe Leonard's (former Assistant Secretary for Civil Rights) front office. *See* Leonard Depo. at  134; Walcott Depo. at 21-23.

11.     While under the supervision of Sheila Walcott in ERCD, cases were assigned in three ways, self-generated, phone call contact and assignment by the supervisor. Walcott attests that ADR is cultivated through relationships forged with other Agencies and the business of ERCD is "customer driven." *See* First ROI at 000254 (Exh.8).

12.     Ms. Walcott placed Complainant on a Lean Six Sigma Group while she was his supervisor.  *See* Albert Depo. at 17.

13.     Albert believes and has attested that he is a neutral and does not believe in building relationships with people in other Agencies to create ADR business.  *See* Albert Depo. at 43-44.

14.     Albert alleges that Ms. Pitchford was "groomed" to be selected for the position of ADR Specialist, GS14, the position for which he interviewed, but was not selected in September 2014.  *See* Albert Depo. at  26.

15.     In ERCD under the supervision of Ms. Walcott, cases were generated in three ways by walk-in, phone calls or self-generated through networking with other agencies. *See* First ROI at 000254 (Exh.8 p. 000254); Albert Depo. at 33-34.

16.     On occasion, after speaking with Albert, potential clients would call the main office and ask to speak with another specialist. *See* First ROI at 000271(Exh. 11 p. 271); *see also* Albert Depo. at 35-38.

17.     Albert attested that Ms. Walcott did not use the word "no" when he inquired about program cases. *See* Albert Depo. at 29-31.

18.     Albert was assigned to a detail with the Office of Adjudication effective June 27, 2011 because of Plaintiff's prior experience working as an EEO counselor. *See* First ROI at 000260 (Exh.8 p. 000260) and First ROI at 000283 (Exh. 14 p. 000283).

19.     During FY 2009, Albert received a "Superior" performance rating. Complainant believes he received this rating because he is being discriminated against. *See* Albert Depo. at 54-58.

20.     During FY 2009, Ms. Pitchford, also received a "Superior" performance rating. *See* First ROI at 000288 (Exh.16 p. 000288).

21.     During FY 2010, both Albert and Ms. Pitchford received a "Superior" rating. *See* Albert Depo. at 59; *see* also First ROI at 000289 (Exh.16 p. 000289).

22.     In July 2011, Albert learned he would be reassigned. At that time, Albert spoke with Winona Scott, Associate Assistant Secretary for Civil Rights and expressed that he did not wish to be reassigned. Thereafter, Albert was not reassigned. *See* Albert Depo. at 62-63.

23.     Albert has sought counsel and advice in the past on how he could improve upon his training and presentation. Scaggs Depo. at 31-32.

24.     Albert was assigned to a detail to the Office of Adjudication effective June 27, 2011, because of his degree in English and his prior experience working as an EEO counselor, *See* First ROI at 000260 (Exh. 8 p. 000260) and First ROI at 000283 (Exh. 14 p. 000283).

25.     During Albert's detail, Ms. Walcott drove his computer in her personal vehicle for Albert to use while on his detail. *See* Albert Depo. at 61-62.

26.     Cyrus Salazar, (Caucasian, Hispanic, male, over 40), GS 15, became the Director of ERCD and Albert's immediate supervisor, on January 26, 2014; prior to this date, Mr. Salazar was not employed by USDA in any capacity. *See* Salazar Depo. at 12.

27.     Mr. Salazar was not aware of Albert's prior EEO activity. *See* Second ROI at 000110) (Exh. 7 p. 000110).

28.     Albert applied for Vacancy Number AG-0ASCR-2014-0199MP for the position of ADR Specialist, GS 14. *See* Second ROI at 000089 (Exh. 6 p.000089).

29.     Albert was determined to be "qualified" by Human Resources and was interviewed by a panel in August 2014 for Vacancy Number AG-0ASCR-2014-0199MP. *See* Second ROI at 000090 (Exh. 6 p. 000090).

30.     Albert was not selected by Cyrus Salazar, the selecting official, based upon the scoring of the panel, which was comprised of William Scaggs, (White, Male. Methodist), GS-14; Alicia Rodriguez, (White, Hispanic, Catholic, Over 40), GS-14; and David King (African American, Male, Over 40), Senior Executive Service.  Salazar Depo. at 77-79.

31.     Albert alleges that he was not selected for the position because of his race, color, age, sex and religion. *See* Second ROI at 000091 (Exh. 6 p. 000091).

32.     On November 3, 2014, Albert's Performance Evaluation was changed from an initial "Outstanding" to "Superior" from his supervisor, Cyrus Salazar. *See* First ROI at 000118 (Exh. 8 p. 000118).

33.     Regarding Albert's performance evaluation, Mr. Salazar was adhering to a mandate that all supervisors review their performance evaluations and make changes where necessary. *See* Second ROI at 000141 (Exh. 9 p. 141).

34.     In addition to Albert's performance evaluation, Mr. Salazar changed all employees' performance evaluations in ERCD to "Superior" except for the Administrative Assistant. *See* Second ROI at 000118 (Exh.7 p.000118).

35.     Mr. Salazar addressed the changes to the evaluations when he met with his subordinates, to include Albert. *See* Albert Depo. at 68.

36.     Albert alleges the Agency subjected him to discrimination on the bases of sex, (male), race (white), age (born in 1952), religion (Jewish), and Reprisal (prior EEO activity)/Terms and Conditions of Employment, Training, Appraisal/Evaluation, Reassignment (directed), Harassment (non-sexual).  *See* Complaint at 12-19.

37.     The date that Plaintiff first sought counseling into the matters at issue in this action is reflected in the date of contact with the EEO office on June 28, 2012, wherein he complained about events as far back as 2009.  *See* First ROI at 00024-27, 00032, 00040; Complaint, ¶¶ 33,  38, 42 (complaining about performance appraisals from years before 2012 and a six-month detail that began in June 2011);

38.     Plaintiff first sought counseling as to the non-selection on September 8, 2014. Second ROI at 00051-00055.

39.     Despite Plaintiff's allegation that he was deprived of the use of his computer of choice during and in the weeks after his detail, Plaintiff admits that, prior to initiating this civil action, the computer of Plaintiff's choosing had been relocated to his office while he was on detail, and returned within a matter of weeks upon his return to following the six-month detail,

which began on June 21, 2011.  Complaint, ¶¶ 38-42; *See* First ROI at 000238 (Exh. 6 p. 000238); Albert Depo. at 60-61.

40.     Ms. Walcott personally drove the computer to Albert's detail site; and upon his return to ERCD, Albert wanted his computer returned to his desk, and, although it took roughly two weeks for the computer to be returned (because another employee was utilizing the work station and computer; another computer was provided for Albert in the interim, and Albert's computer was ultimately returned to him. *See* Complaint, ¶¶ 38-42, First ROI at 000257 (Exh. 8 p. 000257); Albert Depo. at 60-61.

<div align="center" style="margin-left:40%">

Respectfully submitted,


JESSIE K. LIU, DC Bar #472845
United States Attorney


DANIEL F. VAN HORN, DC Bar #924092
Chief, Civil Division


By:_____/s/
   W. MARK NEBEKER, DC Bar #396739
   Assistant United States Attorney
   555 4th Street, N.W.
   Washington, DC  20530
   (202) 252-2536
   mark.nebeker@usdoj.gov

</div>