# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAWRENCE ALBERT,

     Plaintiff,

       v.

SONNY PERDUE, Secretary, U.S.
Department of Agriculture,

     Defendant.

Civil Action No. 17-1572 (JEB)

## MEMORANDUM OPINION

Plaintiff Lawrence Albert is a white, Jewish man over sixty years old. After an almost-40-year career at the United States Department of Agriculture, Albert brought this suit, alleging a host of discriminatory and retaliatory actions by his supervisors. Chiefly, he claims that his non-selection for a grade 14 position violated Title VII and the Age Discrimination in Employment Act. Albert further alleges that he was subjected to a hostile workplace at USDA and that reduced responsibilities, lower-than-Outstanding performance evaluations, and a six-month assignment in a different division violated his rights. Defendant Sonny Perdue, Secretary of Agriculture, now moves for summary judgment on all counts, contending that no reasonable jury could find that Albert suffered discrimination or retaliation or was subjected to a hostile environment. Concluding that only Plaintiff's non-selection and reduced-responsibilities claims survive, the Court will grant in part and deny in part Defendant's Motion.

## I.    Background

As it must at this stage, the Court sets out the facts here in the light most favorable to Plaintiff. See Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011). Although more details of

1

particular claims appear in the Analysis, *infra*, the Court will lay out the general background here. Albert joined USDA in 1980, where he began his career as a Food Program Specialist. See Def. Mot., Statement of Material Facts (SMF), ¶ 4. After holding that position for 14 years, he completed a detail as an Equal Employment Specialist in the Department's Civil Rights office. Id., ¶¶ 4–5. That detail became permanent, and Albert continued serving in that capacity until 2000. Id., ¶ 6. Later that year, USDA assigned him to a detail in its Conflict Prevention and Resolution Center (CPRC), a predecessor office to the Early Resolution and Conciliation Division (ERCD) within the Office of the Assistant Secretary for Civil Rights (OASCR). Id., ¶¶ 6–7. While on detail there, Albert accepted a permanent position. Id., ¶ 7. In addition to these roles, Plaintiff has served as an Early Resolution and Conciliation Specialist, GS–13, through the time he filed his Complaint. Id., ¶ 3. In that role, Albert assisted employees who filed or were considering filing Equal Employment Opportunity complaints and are seeking Alternative Dispute Resolution. See Def. Mot., Exh. 1 (First Deposition of Lawrence Albert) at 15; Compl., ¶ 18.

In Albert's view, the last eight years of his nearly four-decade-long tenure with USDA have been plagued by substantial work-related mistreatment. See Compl., ¶¶ 87–134. He points to his reduced workload, non-stellar performance evaluations, and a six-month assignment in a different division. Id. He also takes issue with Defendant's decision not to select him for a vacancy in the position of Dispute Resolution Specialist, GS–14. Id. So Plaintiff filed two discrimination complaints with the Equal Employment Opportunity Commission — one in 2012, the other in 2014 — alleging that Defendant discriminated against him on the basis of his race, religion, sex, prior EEO activity, and age. See Def. Mot., Exh. A (First Report of Investigation (ROI)) at 23; Exh. B (Second ROI) at 2, 89. Albert initially sought a hearing from an

administrative judge but rescinded this request to allow the agency to reach a final decision on his claim. See Compl., ¶¶ 5–6. But the agency did not do so within the allotted 40-day timeline, as set out under applicable law. See 29 C.F.R. § 1614.110(b); Compl., ¶ 8.

As a result, on August 3, 2017, Plaintiff filed suit in this Court, asserting eight causes of action. See Compl., ¶¶ 87–134. He alleges that Defendant violated Title VII and the ADEA by generally discriminating against him, harassing him, and creating a hostile work environment because of his race (Count I), color (Count II), sex (Count III), religion (Count IV), prior EEO activity (Count V), and age (Count VI). Plaintiff also separately maintains that his non-selection was the result of the same forms of discrimination in violation of Title VII (Count VII) and the ADEA (Count VIII). Defendant has now moved for summary judgment on all counts.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. See Laningham v. Navy, 813 F.2d 1236, 1241–42 (D.C. Cir. 1987). In light of this requirement, and pursuant to Local Civil Rule 7(h) and Federal Rule 56(c), the Court, in resolving summary-judgment motions, "assume[s] that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Local Civ. R. 7(h)(1).

## III. Analysis

In considering Defendant's Motion for Summary Judgment, the Court first addresses the heart of the suit — namely, Albert's non-selection counts. It next considers his hostile-work-environment claims and concludes with the remaining discrete claims of discrimination and retaliation.

A.  Non-Selection

In 2014, USDA advertised two vacant Dispute Resolution Specialist, GS–14, positions.
See Second ROI at 89.  Cyrus Salazar — Director of ERCD and Albert's immediate
supervisor — convened a panel to interview and assess the pool of candidates seeking these
positions.  See Def. Mot., Exh. 5 (Deposition of Cyrus Salazar) at 12, 77–79.  In assembling his
panel, Salazar followed the guidance of the National Finance Center, which provides services to
federal agencies.  Id. at 73, 77–79; SMF, ¶ 30.  To wit, Salazar selected a diverse panel
comprised of David King (black, over the age of 40), Alicia Rodriguez (white, Hispanic,
Catholic, over the age of 40), and William Scaggs (white, Methodist).  See Def. Mot, Salazar
Depo. at 77–79; SMF, ¶ 30.  The panel, in turn, interviewed seven candidates, including
Plaintiff.  See Def. Mot., Salazar Depo. at 12; Reply, Exh. D (Panelists' Interview Information)
at 246, 255, 264.  Salazar then reviewed the panelists' scores and selected Anita Pitchford and
Edward Profit — the two highest-scoring candidates — for the vacant positions.  See Def. Mot.,
Salazar Depo. at 157; see also Opp. at 13.  Both Pitchford and Profit are black, non-Jewish, and
younger than Albert.  See Opp., Exh. 26 (Anita Pitchford Affidavit) at 274; Opp., Exh. 25
(Edward Profit Affidavit) at 193; Opp. at 13.

In seeking summary judgment here, Defendant states that Albert did not gain the position
because of his poor performance on the interview.  See Def. Mot. at 15–16; Reply at 3.  Plaintiff,
on the other hand, attributes his non-selection to discrimination on the basis of his race, color,
sex, religion, and age, as well as retaliation for having filed EEO complaints.  See Compl.,
¶¶ 87–134.

1. *Legal Framework*

Title VII makes it unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment[] because of such individual's race, color, religion, [or] sex." 42 U.S.C. § 2000e–2(a)(1). It also forbids retaliation against employees who engage in protected EEO activity. Id. § 2000e–3(a). The ADEA likewise prohibits discrimination against an employee on the basis of age. See 29 U.S.C. § 623(a)(1). Individuals 40 years of age and older are included in the protected class. Id. § 631(a).

In weighing a discrimination or a retaliation claim under Title VII or the ADEA, the Court must follow the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973). See Ford v. Mabus, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying framework to ADEA claims); Taylor v. Small, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (applying framework to Title VII claims). Under this framework, the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination or retaliation. See 411 U.S. at 802 (applying framework to discrimination claim); see also Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009) (applying framework to retaliation claim). To pass that hurdle, she need only show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action give rise to an inference of discrimination." Czekalski, 475 F.3d at 364 (internal quotation marks and citation omitted); see also Hamilton v. Geithner, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (requiring plaintiff to declare that he engaged in protected activity under Title VII to establish *prima facie* retaliation claim).

Next, the defendant may rebut that *prima facie* showing with evidence of a "'legitimate, nondiscriminatory reason' for its action." Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C.

Cir. 2006) (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802).  Finally, if the defendant has produced such evidence, then the plaintiff must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000) (quoting <u>Tex. Dep't of Cmty Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).

When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," the Court "need not—and should not—decide whether the plaintiff actually made out a *prima facie* case" because it should focus only on the third part of the <u>McDonnell Douglas</u> analysis.  <u>See</u> <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008).  But, as our Circuit recently held, this "<u>Brady</u> shortcut" does not "relieve the employer of its burden . . . 'to articulate a legitimate, nondiscriminatory reason for its action.'"  <u>Figueroa v. Pompeo</u>, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (quoting <u>Wheeler v. Georgetown Univ. Hosp.</u>, 812 F.3d 1109, 1114 (D.C. Cir. 2016)).

With that windup, the Court will now turn to Albert's Title VII and ADEA claims concerning his non-selection for the position of ADR Specialist, GS–14.  <u>See</u> Compl., ¶¶ 87–134.  Because such non-selection is clearly an adverse employment action, <u>see</u> <u>Kalinoski v. Gutierrez</u>, 435 F. Supp. 2d 55, 69 (D.D.C. 2006), the Court need not perform any further threshold analysis of whether he has established a *prima facie* case of discrimination.  <u>See</u> <u>Brady</u>, 520 F.3d at 494.  It will instead examine the sufficiency of Defendant's nondiscriminatory explanation for Albert's non-selection and next decide whether a jury could find this pretextual.

### 2. *Legitimate, Nondiscriminatory Explanation*

To justify its non-selection, Defendant maintains that Albert was not qualified for the GS-14 position based on his interview performance.  In assessing whether this is a legitimate,

nondiscriminatory reason, the Court considers four factors: (1) whether the employer produced evidence that would be admissible at the summary-judgment stage; (2) whether the factfinder, if it believes the evidence, could reasonably "find that the employer's action was motivated by a nondiscriminatory reason"; (3) whether the employer's explanation is "facially credible in light of the proffered evidence"; and (4) whether the employer's evidence presents a "clear and reasonably specific explanation" such that the employee has "a full and fair opportunity to attack the explanation as pretextual." Figueroa, 923 F.3d at 1087–88 (internal quotation marks and citations omitted). The Court will address each factor in turn.

First, Defendant has produced evidence that may be considered at summary judgment, including the notes of each panelist and his or her scores and ratings for each of the seven applicants. See, e.g., Panelists' Interview Info. at 245–71. The Government has also presented deposition testimony from Salazar — the selection official who designed the interview process — and two of the three interview panelists. Albert does not challenge the admissibility of any of this evidence.

Second, if a factfinder credited Defendant's evidence, it could reasonably determine that the agency's action was motivated by a nondiscriminatory reason. Put differently, the evidence would allow a reasonable factfinder to conclude that Albert was not among the highest-scoring candidates eligible for the vacant GS–14 position. See Fischbach v. D.C. Dep't of Corrs., 86 F.3d 1180, 1182 (D.C. Cir. 1996) (finding that employer's choice of one of two candidates "based solely upon their answers during the interview, as reflected in the score that the interview panel assigned to each applicant" was sufficient to survive McDonnell Douglas's second step); see also Holcomb, 433 F.3d at 896 (concluding that employer's decision to hire "best applicant" for a position was a legitimate, nondiscriminatory reason).

Third, Defendant's nondiscriminatory explanation is "facially 'credible' in light of the proffered evidence." Figueroa, 923 F.3d at 1088 (citing Bishopp v. District of Columbia, 788 F.2d 781, 788–89 (D.C. Cir. 1986)). The selecting official offered the vacant specialist positions to the two candidates who received the highest interview scores. See Def. Mot., Salazar Depo. at 157. Albert, conversely, ranked in the bottom half of candidates. See Panelists' Interview Info. at 246, 255, 264 (placing Plaintiff in fourth, fifth, and sixth place out of seven). Defendant's explanation is therefore legitimate. See Figueroa, 923 F.3d at 1088.

Fourth and finally, Defendant has produced a "clear and reasonably specific explanation." Id. As in Nelson v. USAble Mutual Insurance Co., 918 F.3d 990 (8th Cir. 2019), the agency set up an interview system with specific rating criteria. Id. at 992, cited approvingly in Figueroa, 923 F.3d at 1090–91. More concretely, the three panelists asked the seven candidates the same five questions designed to evaluate leadership, time management, development, experience, and vision. See, e.g., Panelists' Interview Info. at 245–53. They scored their responses 0–5, ranging from "[no] knowledge/[n]o experience" to "Superior/excellent knowledge." Id. at 246. The interview scoring matrices reveal that two panelists ranked Albert lower than Pitchford and Profit — the two candidates whom Salazar offered the vacant positions — in every category. Id. at 255, 264 (Scaggs's and Rodriguez's scoring matrices). Albert fared slightly better with the third panelist, scoring the same as Pitchford and Profit on three categories but lower in time management and development. Id. at 246 (King's scoring matrix). With the scoring matrices and "precise breakdown between the [seven] candidates, [Plaintiff] easily could determine which factors [he] should challenge at the third prong of the McDonnell Douglas framework." Figueroa, 923 F.3d at 1090; see also Holcomb, 433 F.3d at 896 (concluding that employer presented a legitimate, nondiscriminatory

explanation after pointing to specific evaluation criteria).  Because Defendant's reasons "have been articulated with some specificity," the agency has provided Albert "with 'a full and fair opportunity' to attack the explanation as pretextual."  Figueroa, 923 F.3d at 1088 (quoting Lanphear v. Prokop, 703 F.2d 1311, 1316 (D.C. Cir. 1983).

In short, because Defendant has satisfied all four Figueroa factors, he has met his burden to offer a legitimate, nondiscriminatory reason — namely, that Albert's non-selection was due to his poor interview performance.

### 3.  *Pretext*

The burden now shifts to Plaintiff to provide sufficient evidence by which a reasonable jury could find this stated reason was pretext for discrimination or retaliation.  See Brady, 520 F.3d at 494.

To start, Plaintiff contends that OASCR promotes black candidates and other minorities at a higher rate than other employees.  See Opp. at 27.  He also points out that he was the "only non-minority employee" in his division.  Id.  For support, Albert offers a snapshot of the employee makeup — including sex-, race-, and gender-related information — in ERCD for 2012–14.  See Opp., Exh. 11 (General Workforce Profile Data) at 225–30.  In disparate-treatment cases — unlike in the disparate-impact context — "statistical evidence is less significant because the ultimate issue is whether the particular plaintiff was the victim of an illegitimately motivated employment decision."  Krodel v. Young, 748 F.2d 701, 710 (D.C. Cir. 1984); see also Hairston v. Vance-Cooks, 773 F.3d 266, 274–75 (D.C. Cir. 2014).  "Information regarding the demographic breakdowns of a workplace is rarely taken into account without a showing of statistical significance, usually provided by an expert."  Stoe v. Sessions, 324 F. Supp. 3d 176, 198 (D.D.C. 2018) (citations omitted).

The data, to be sure, shows that most employees in ERCD were black.  See General Workforce Profile Data at 225–30.  But Plaintiff's evidence says nothing about the composition of the applicant pool for OASCR or ERCD positions, and it fails to consider the possibility that some minority applicants may prefer civil-rights-related placements.  Without more, "plaintiff's numbers are simply irrelevant."  Horvath v. Thompson, 329 F. Supp. 2d 1, 11 (D.D.C. 2004); see also Thomas v. Chao, 65 F. App'x 321, 324 (D.C. Cir. 2003) ("The District Court was correct to exclude from evidence the list of employees identified by race and sex, and witness' observations about the race and sex of employees, in the absence of an expert who could testify that the alleged underrepresentation was statistically significant.").  For these reasons, Albert's first argument falls short as a matter of law.

Next up is his contention that the interview process was riddled with flaws.  See Opp. at 28–34.  In our Circuit, "a plaintiff attacking a qualifications-based explanation is expressly not limited to comparing [his] qualifications against those of the successful applicant."  Holcomb, 433 F.3d at 897.  Rather, he "may seek to expose other flaws in the employer's explanation."  Id. To that end, Plaintiff attempts to cast doubt on the interview panelists' scores, arguing that he should have obtained higher scores than Pitchford and Profit on all but one question.  See Opp. at 30–32.

This argument is premised on the notion that "[t]he assessment of interview performance is inherently subjective."  McIntyre v. Peters, 460 F. Supp. 2d 125, 137 (D.D.C. 2006); see also Stoe, 324 F. Supp. 3d at 193.  Although "employers may of course take subjective considerations into account in their employment decisions," this Circuit has previously noted its concern that subjective criteria may be used to "camouflage discrimination."  Hamilton, 666 F.3d at 1356. Here, based on the evidence in the record, a reasonable juror could conclude that the panelists

took some liberties with Albert's assessment. Take, for example, their scores on Question 4, which was designed to evaluate each candidate's ADR experience. See Opp., Exh. 30 (Interview Questions) at 123 ("As a Dispute Resolution Specialist, these positions will require expertise in ADR. Please elaborate on your experience in ADR."). Panelists Scaggs and Rodriguez rated Albert's experience a 3 out of 5. See Panelists Interview Info. at 255, 264. Profit and Pitchford, on the other hand, each obtained a score of 5. Id. Albert, Pitchford, and Profit all obtained a score of 3 from panelist King. Id. at 246.

What makes the scores mystifying is that Albert had more ADR experience than Pitchford and Profit combined. He had performed hundreds of mediations over 20 years in the field. See Opp., Exh. 6 (Affidavit of Lawrence Albert – Second ROI) at 90. By contrast, Pitchford had 14 years of total work experience, and Profit had about three years of mediation experience. See Opp., Exh. 18 (First Deposition of Cyrus Salazar) at 85–86. Even Plaintiff's former supervisor, Sheila Walcott, acknowledged that Albert was the most experienced ADR specialist in the division. See Opp., Exh. 17 (Deposition of Sheila Walcott) at 63, 67. The interview panelists, too, were aware of Albert's experience. For one, they were provided a copy of each applicant's resume at the time of the interview. See Opp., First Salazar Depo. at 83. More telling still are the panelists' own interview notes, which acknowledged Plaintiff's lengthy experience. See Panelists' Interview Info. at 249, 258, 267.

Two of the panelists attempted to explain the differences in the candidates' scores, but they failed to "ground[] their subjective assessment in more objective facts." Hamilton, 666 F.3d at 1356. On the experience question, Rodriguez said that she based her ratings on how the candidates "articulated" their responses. See Opp., Exh. 3 (Deposition of Alicia Rodriguez) at 55. And when asked why Plaintiff did not receive the maximum score on experience, Scaggs

stated: "[T]here must have been something in the presentation that didn't strike [me] to take it to that level." These explanations could give a reasonable juror some pause. See Aka, 156 F.3d at 1298 (noting that "an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination").

There's more. Evidence in the record shows that some panelists based their evaluation of the candidates on subjective considerations that were not part of the hiring criteria. See Lane v. Vazquez, 961 F. Supp. 2d 55, 67 (D.D.C. 2013); see also Johnson v. Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982) ("[T]he adherence to or departure from internal hiring procedures is a factor that the trier of fact may deem probative and choose to consider in determining the true motivation behind the hiring decision of the prospective employer."). Rodriguez and Scaggs, for example, both accounted for the candidates' communication skills when evaluating the applicants. More specifically, Rodriguez's ratings took into account how the candidates "articulated" their responses. See Rodriguez Depo. at 55. Similarly, Scaggs explained that "communication skills were really important." Opp., Exh. 2 (Deposition of William Scaggs) at 34–35. Scaggs said that Plaintiff was not "very concise" and "rambl[ed]" — factors that hurt Albert's overall rating. See Reply, Exh. D (Deposition of William Scaggs) at 37–38. When describing Pitchford's interview experience, on the other hand, Scaggs mentioned her "great communication skills." Id. at 45. As for Profit, Scaggs described him as "very dynamic," "very concise," and "very confident." Id. at 44. A factfinder could conclude, conversely, that the hiring criteria were directed solely to leadership, organization/time management, development, experience, and vision. See Interview Questions at 123. "Given the vague and subjective nature of the panelists' assessment," a jury could infer that Defendant's justification was camouflage for discrimination and retaliation. See Hamilton, 666 F.3d at 1357.

To be sure, the Court is not a "super-personnel department that reexamines an entity's business decisions." Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007) (citation omitted). Indeed, it retains its longstanding reservations about deep dives into such personnel choices. Given our Circuit's recent decisions, however, and considering the evidence in the light most favorable to Albert, it cannot hold as a matter of law that Defendant's decision was in fact based on its proffered nondiscriminatory rationale. See Markowicz v. Nielsen, 316 F. Supp. 3d 178, 196 (D.D.C. 2018) ("Reviewing the record as a whole, the evidence of [the plaintiff's] superior qualifications, taken together with 'other flaws in the employer's explanation, creates a genuine issue of material fact that only a jury can resolve.'") (citation omitted). Although a reasonable jury might well so infer, it might instead believe that the explanation was merely pretext for passing over Albert. As such, Plaintiff's non-selection claim survives summary judgment, if not by much.

B. Hostile Work Environment

Plaintiff next argues that Defendant created a hostile work environment in violation of Title VII (Counts I–V) and the ADEA (Count VI). See Compl., ¶¶ 87–127. Although these allegations are brought under two separate statutory schemes, they are analyzed under the same framework. See Mohktar v. Kerry, 83 F. Supp. 3d 49, 82 (D.D.C. 2015) ("Courts apply the same analysis when evaluating a hostile work environment claim under Title VII and the ADEA."); see also Ware v. Hyatt Corp., 80 F. Supp. 3d 218, 227 (D.D.C. 2015) ("Assuming that a hostile work environment claim can be brought under the ADEA, the same [Title VII] standard would apply.").

To prevail on a hostile-environment claim, a plaintiff must show that his employer subjected him to "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation omitted). In evaluating such a claim, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)). By adhering to these standards, the Court thereby "ensure[s] that [employment-discrimination law] does not become a 'general civility code'" that involves courts in policing "the ordinary tribulations of the workplace." Faragher, 524 U.S. at 788 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); then quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)).

Here, Albert maintains that a series of acts by Defendant created an actionable environment. He bases his theory on the following evidence:

- Albert's second-line supervisor invited him and other Jewish employees to a tour of the Holocaust Memorial Museum in Washington, D.C., see Def. Mot., Exh. 3 (Deposition of Joe Leonard) at 127–32; Exh. 2 (Second Deposition of Lawrence Albert) at 72–73, 114–15, and his immediate supervisor encouraged him to attend Holocaust Remembrance Day held at the museum's theatre, see First Albert Depo. at 72–77;

- In 2011, Albert's second-line supervisor assigned him to a six-month detail in the Employee Complaints Division, an experience of "no value" to Albert's career, see Opp., Exh. 22 (Lawrence Albert's 2011 Detail Assignment Letter) at 283; Exh. 9 (Affidavit of Lawrence Albert – First ROI) at 240;

- After Albert finished his detail and returned to ERCD, the agency delayed the return of his preferred work computer, see Opp., Albert Aff. – First ROI at 238;

- In 2011, although Albert received a "Superior" overall rating in his annual performance evaluation, see Opp., Exh. 19 (2011 Lawrence Albert Performance Appraisal) at 73, Pitchford received an "Outstanding" overall rating for the same period, see Opp., Exh. 20 (2011 Anita Pitchford Performance Appraisal) at 98;

- In 2012, Albert's second-line supervisor <u>considered</u>, but ultimately declined to transfer Albert from ERCD to another division, <u>see</u> First Albert Depo. at 62–63;

- Albert received a "Superior" overall rating in his 2012 annual performance evaluation, <u>see</u> Albert Aff. – First ROI at 237;

- In 2014, Albert's immediate supervisor lowered his and several others' preliminary "Outstanding" overall performance ratings to "Superior." <u>See</u> Opp., Exh. 8 (Affidavit of Cyrus Salazar – Second ROI) at 118–19. Although there appears to be a discrepancy as to the year of the performance evaluation, the Court's review of the record shows that the change to the evaluation occurred on November 2014, <u>id.</u> at 118;

- Albert's immediate supervisor did not select him for one of two GS–14 positions, <u>see</u> Def. Mot., Second ROI at 89; <u>see also</u> Section III.A, *supra*; and

- The agency assigned Pitchford — whom Albert's immediate supervisor selected for the other of the two GS–14 vacancies — a larger caseload than Albert. <u>See</u> Opp., General Workforce Profile Data at 20.

Even viewing the evidence in the light most favorable to Albert, the Court finds that it is a far cry from satisfying the "demanding standard" for a hostile-work-environment claim under federal law. <u>See</u> <u>Baird v. Gotbaum</u>, 662 F.3d 1246, 1251 (D.C. Cir. 2011). His slights in no way approach the bar set for this type of cause of action. <u>See, e.g.</u>, <u>Nurriddin v. Bolden</u>, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (finding that "removal of important assignment, lowered performance evaluations, and close scrutiny of assignments" "cannot be characterized as sufficiently intimidating or offensive in an ordinary workplace context"); <u>Na'im v. Rice</u>, 577 F. Supp. 2d 361, 377 (D.D.C. 2008) (determining that low performance evaluations and non-selection fail to create hostile work environment); <u>see also</u> <u>Beckwith v. Ware</u>, 174 F. Supp. 3d 1, 3, 5 (D.D.C. 2014) (concluding that denial of access to agency's computer system, among other things, was insufficient to satisfy hostile-work-environment standard).

Albert's focus, puzzlingly, is on the incidents in which his supervisors invited him to the Holocaust Memorial Museum and Remembrance Day. He believes that this was condescending

and somehow singled him out as Jewish. Of course, one could just as easily envision a <u>lack</u> of an invitation being characterized as a snub. This is far too slim a reed on which to base such a claim. <u>See, e.g.</u>, <u>Badibanga v. Howard Univ. Hosp.</u>, 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing hostile-work-environment claim where plaintiff was placed on administrative leave via false accusation, his accent was criticized, he was told he was easy to replace with an American, and he was told that his supervisor would not hire other Africans); <u>George v. Leavitt</u>, 407 F.3d 405, 408, 416–17 (D.D.C. 2005) (statements by employers that plaintiff should "go back where she came from," separate acts of yelling, and hostility did not create hostile work environment).

In brief, no reasonable juror could find that the actions Plaintiff cites amount to a hostile work environment. Judgment will thus be entered on all hostile-environment claims.

C. <u>Other Theories of Discrimination and Retaliation</u>

In addition to his non-selection allegation, Plaintiff relies on the eight other discrete acts listed in Section III.B, *supra*, to support his Title VII and ADEA claims in Counts I–VI. <u>See</u> Compl., ¶¶ 87–122. Defendant, in this Motion, argues that several of these allegations either have not been properly exhausted or do not amount to adverse actions. <u>See</u> Def. Mot. at 11–12, 19, 22–24, n.2; Reply at 7–8. The Government, alternatively, provides legitimate, nondiscriminatory explanations for these acts. <u>See</u> Def. Mot. at 17–20. Each of these positions will be considered separately.

1. *Exhaustion*

Before bringing a lawsuit in federal court under Title VII or the ADEA, federal employees must exhaust their administrative remedies. <u>See</u> 42 U.S.C. § 2000e–16(c) (Title VII exhaustion requirements); 29 U.S.C. § 633a(b)–(d) (ADEA exhaustion requirements); <u>Rafi v.</u>

Sebelius, 377 F. App'x 24, 25 (D.C. Cir. 2010) (affirming dismissal of Title VII and ADEA claims for failure to exhaust). "This administrative exhaustion requirement applies to all discrete acts of discrimination or retaliation." Nurriddin v. Goldin, 382 F. Supp. 2d 79, 92 (D.D.C. 2005). To initiate the process, a federal employee must "contact an EEO counselor to complain about the alleged violation within 45 days of its occurrence." Koch v. Walter, 935 F. Supp. 2d 164, 169–70 (D.D.C. 2013) (citing 29 C.F.R. §1614.105). Because "[e]ach discriminatory [or retaliatory] act starts a new clock for filing charges alleging that act," moreover, an employee must exhaust administrative remedies for each discrete claim. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

Here, Albert first sought contact with the EEO office on June 28, 2012. See ECF No. 24 (Errata, First ROI) at 32. As a result, any discrete discriminatory or retaliatory acts occurring before May 14, 2012 — that is, 45 days earlier — are untimely. To that end, Albert's allegations about his six-month detail in the Employee Complaints Division (2011), the agency's delay in retrieving his preferred work computer when he returned to ERCD after completing such detail (2011), and his and Pitchford's 2011 performance evaluations are all out of bounds. See Rafi, 377 F. App'x at 25; see also Compl., ¶¶ 33–34, 38–44.

### 2. *Adverse Employment Action*

Of the remaining acts that are timely, two more falter at the next hurdle. To assert a discrimination or retaliation claim, Plaintiff must show that he "suffered an adverse employment action," Brady, 520 F.3d at 494, defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009) (citing Taylor, 350 F.3d at 1293).

Albert maintains that his invitation to the Holocaust Memorial Museum and Remembrance Day and his potential transfer out of ERCD — an act that never materialized — serve as further examples of discrimination and retaliation. See Opp. at 6–7, 10–11, 19, 38 n.17. Yet, he "offers no evidence that any of these acts resulted in a change in [his] benefits, responsibilities, or job title, and they therefore cannot provide the basis for [his] discrimination [and retaliation] count[s]." Dreiband v. Nielsen, 319 F. Supp. 3d 314, 320 (D.D.C. 2018); see also Baloch, 550 F.3d at 1199 (explaining that planned suspensions that were never served did not constitute adverse employment actions); Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001) ("[N]ot everything that makes an employee unhappy is an actionable adverse action. Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit.") (internal quotation marks omitted) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). Because the two aforementioned events do not constitute adverse employment actions, Plaintiff may not rely on them to support his discrimination and retaliation claims in Counts I–VI.

*      *      *

For those keeping track, three discrete acts of alleged discrimination and retaliation remain: (1) Albert's 2012 "Superior" performance evaluation; (2) Defendant's lowering of his performance evaluation from "Outstanding" to "Superior" in 2014; and (3) the uneven distribution of work assignments. The Court's next task is to determine whether these allegations survive summary judgment under the McDonnell Douglas test articulated in Section III.A.1, supra.

### 3. *Performance Reviews*

First, a few notes on Albert's reviews. In October 2012, his then-supervisor, Sheila Walcott, rated his performance as "Superior" — the second-highest score available. See Albert Aff. – First ROI at 237. Two years later, Salazar — Albert's immediate supervisor — gave Albert and everybody else an initial rating of "Outstanding." See Second ROI at 118. But Salazar's supervisor did not support high ratings across the board and advised him to reassess the performance evaluations. Id. So Salazar decided to lower all his staff members' ratings — with the exception of an administrative assistant — to "Superior." Id. At the time, employees in Salazar's staff included Albert, Pitchford, Profit, and three others. Id. These are the two ratings he complains of here.

Albert presented evidence that his "Superior," rather than "Outstanding," ratings in 2012 and 2014 decreased his monetary performance award. See Albert Aff. – Second ROI at 104 ("The amount of performance award I received was lower since the award was based on my discriminatory, lower rating."); id. (seeking to "reinstate the 'Outstanding' rating retroactively with the comparable performance award"); see also First ROI at 237 ("The lower appraisal [in 2011] resulted in me receiving half the amount of performance award that Ms. Pitchford received for getting an 'Outstanding' performance evaluation, $750 versus $1500."). Because Albert's performance ratings directly led to monetary loss, and "a lower performance rating can constitute an adverse employment action," Bruder v. Chu, 953 F. Supp. 2d 234, 241–42 (D.D.C. 2013) (citing Russell, 257 F.3d at 818–19), the Court can move on to the sufficiency of Defendant's nondiscriminatory explanation for Albert's performance evaluations. See Brady, 520 F.3d at 494.

First, Defendant provides adequate evidence of a legitimate, nondiscriminatory reason for changing Albert's rating in 2014.  If a factfinder believed that Salazar's actions were motivated by a division-wide mandate and that he did not treat other similarly situated employees disparately, it could conclude that Defendant's actions were nondiscriminatory.

Defendant also provides adequate evidence of a legitimate, nondiscriminatory reason for Albert's 2012 rating.  Specifically, Walcott stated that if "he wanted to receive an 'Outstanding' rating," Albert needed to take more initiative and "reach out and work better with co-workers." ECF No. 25 (Errata, First ROI) at 258; see also First ROI at 237.  Indeed, dissatisfaction with a plaintiff's work "is a legitimate and nondiscriminatory reason" for "negative annual performance reviews." Walden v. Patient-Centered Outcomes Research Inst., 304 F. Supp. 3d 123, 134 (D.D.C. 2018).

Concluding that Defendant has met its burden, the Court moves to the third stage of McDonnell Douglas.  At this juncture, it may consider "all relevant evidence, including the strength of the prima facie case and any properly-considered evidence supporting the employer's case." Keeley v. Small, 391 F. Supp. 2d 30, 48 (D.D.C. 2005) (citing Reeves, 530 U.S. at 147–48).  Albert's prima facie case is weak.  Like the plaintiff in Keeley, he received a monetary performance award, just not as large an award as he would have liked.  See 391 F. Supp. 2d at 48.  More importantly, unlike the non-selection claim, there is no material evidence showing a connection between Plaintiff's protected characteristics or his prior EEO activity and the reduced award based on his "Superior" ratings.  In addition, Plaintiff has provided no evidence that any peers outside his protected class received an "Outstanding" rating.

He rejoins that Leonard — who has shown "animus" toward Plaintiff — ordered Salazar to reassess the performance evaluations.  Id.  But that argument overlooks a critical link.

Nothing in the record shows that Leonard ordered Salazar to lower any specific employee's rating — or, most critically, Albert's in particular.  By contrast, all but one non-administrative employee on Salazar's staff had his or her performance evaluation lowered.  See Second ROI at 118.  As for his 2012 performance evaluation, Plaintiff has not even alleged, much less produced evidence that shows, that any of his colleagues received an "Outstanding" rating.  The lack of disparate treatment ultimately dooms Plaintiff's case.  See Warner v. Vance-Cooks, 956 F. Supp. 2d 129, 165–66 (D.D.C. 2013) (citing Bridgeforth v. Jewell, 721 F.3d 661, 665 (D.C. Cir. 2013); Leavitt, 407 F.3d at 412).

Because no evidence casts doubt on Defendant's explanation, it is entitled to summary judgment on these claims.  Plaintiff may not rely on the allegations regarding the 2012 and 2014 performance evaluations to assert a discrimination or retaliation claim in Counts I–VI.

### 4.  *Uneven Distribution of Assignments*

Finally, the Court turns to Albert's allegations of the uneven distribution of assignments. In ERCD, specialists provide ADR services to USDA employees or individuals, such as food-stamp recipients, who use USDA programs.  See Albert Aff. – First ROI at 235.  Over the span of two years — between 2010 and 2012 — Pitchford was assigned 29 cases compared to Albert's 10.  See General Workforce Profile Data at 20.  According to Albert, his lighter caseload deprived him of more ADR experience, thereby reducing his promotion potential.  See First ROI at 235–36.  As evidence, he points out that Pitchford was later selected for a GS–14 position.  See Opp. at 6, 36.  Albert's claim regarding the uneven distribution of assignments thus sufficiently alleges an adverse action.  See Bruder, 953 F. Supp. 2d at 240–41 (explaining that for claim based on workload distribution, plaintiff must show loss of "promotional possibilities"); see also Gasser v. Ramsey, 125 F. Supp. 2d 1, 5 (D.D.C. 2000) (adverse

employment action based on distribution of assignment requires reduced promotion potential). In any event, Defendant does not challenge this component of Plaintiff's claim. See Reply at 7–8.

So, once again, the Court turns to McDonnell Douglas and assesses whether Defendant has proffered a legitimate, nondiscriminatory explanation. The agency offers testimony from Walcott concerning the distribution of case assignments in ERCD. She described how cases were generated and distributed in her division during her tenure as Albert's immediate supervisor. See First ROI at 254. She explained that customers would call her, the ERCD's main number, or specific specialists directly. Id. Walcott characterized the last category as "self-generated" cases. Id.; see also Def. Mot. at 7 (noting that specialists "self-generated through networking with other agencies"). Her policy was that cases generated via phone calls to her or to the division's main number were assigned to specialists "with the lowest number of cases." See First ROI at 254. By contrast, self-generated cases were not centrally assigned; instead, customers who were seeking a particular specialist were accommodated. Id.

She attributes the disparity in case assignments between Albert and Pitchford to two reasons: (1) Pitchford was better at networking and had a stronger pool of contacts, thereby generating more cases; and (2) Albert never volunteered for "program" cases — a subset of ADR cases the agency handled. Id. at 254–56. For further support, Defendant points to Albert's deposition testimony in which he explained that he did not believe that building relationships with other agency representatives was appropriate and that he did not recall ever volunteering to pick up any program cases. See Albert Depo. at 36–37, 102–03. Based on this evidence, a reasonable factfinder could conclude that Albert's reduced caseload was based on the fact that he

did not self-generate as much as Pitchford and because he did not volunteer for program ADR cases.

As the burden shifts back to Plaintiff, the Court notes that some partial holes emerge in Walcott's explanation. First, she testified that Albert never volunteered to take on any cases involving program ADR. See Walcott Depo. at 29; see also First ROI at 256. But later in her deposition, Walcott acknowledged that Albert had asked, "When are we going to get trained so we can work on programs?" Walcott Depo. at 60. That is consistent with Albert's testimony that he wanted to "get in" on program ADR cases. See, e.g., First Albert Depo. at 29–30 ("I'm thinking there's an opportunity for program cases that I know nothing about and I raised — I raised it.").

A reasonable jury, moreover, could infer that Albert was never instructed that he needed to volunteer for cases. He avers that Walcott never "ask[ed] for volunteers" to work on program cases. See Opp., Exh. 23 (Affidavit of Lawrence Albert Rebutting Sheila Walcott's Affidavit) at 244. His position is consistent with Walcott's stated policy to assign cases to specialists "with the lowest number of cases." See First ROI at 254. Notably, a USDA database containing every specialist's assignments shows that program cases were assigned to Pitchford even though she had more assignments than Albert. See Opp., Exh. 12 (USDA Case Assignments) at 57–60. In response, Walcott states that Pitchford was "not assigned" program cases. See Opp., Exh. 7 (Affidavit of Sheila Walcott – First ROI) at 255. Instead, Walcott argues, Pitchford was assisting her in developing an ADR protocol for program cases. Id.; Walcott Depo. at 59. Walcott explained that the program cases were hers and that the assignments were incorrectly entered into the database. See Walcott Depo. at 59. Based on the record evidence, however, a reasonable jury could conclude that the agency deviated from its case-assignment protocol. See

Alford v. Def. Intelligence Agency, 908 F. Supp. 2d 164, 175 (D.D.C. 2012) ("In certain cases, an agency's failure to follow its own regulations or established procedures can provide sufficient evidence of pretext to withstand summary judgment.").

Last, there is evidence that the agency treated Pitchford — a similarly situated employee outside of Albert's protected groups — more favorably. See Brady, 520 F.3d at 495 & n.3. Plaintiff participated in a Lean Six Sigma Program, which trained specialists in program ADR. See Walcott Depo. at 28. Despite his training, Albert was not assigned — or asked for assistance in — a single Program case. See USDA Case Assignments at 57–60. Pitchford, on the other hand, worked on at least eight. Id.

Putting all this together, the Court finds that Plaintiff has met his burden. A reasonable jury could determine that Defendant's proffered explanation is pretext for discrimination or retaliation. As such, Plaintiff's claim regarding the uneven distribution of work assignments survives summary judgment.

IV.    **Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Defendant's Partial Motion for Summary Judgment. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  September 20, 2019